IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| BENJAMIN ROSARIO, | § § | |
| Plaintiff, | § § | |
| v. | § § | 1:18-CV-1008-RP |
| TEXAS VETERANS COMMISSION, | § § § | |
| Defendant. | § | |

## ORDER

Before the Court is Defendant Texas Veterans Commission's ("TVC") Motion for Summary Judgment, (Dkt. 54), and the responsive briefing thereto. Having considered the parties' submissions, the record, and the applicable law, the Court will grant the motion, as set forth below.[1]

## I. BACKGROUND

This case concerns the departure of Plaintiff Benjamin Rosario ("Rosario") from his employment with TVC following an investigation for sexual harassment. Rosario worked as a Veteran's Benefits Counselor at TVC from approximately 2010 until he resigned in November 2017. (Resignation Letter, Dkt. 54-1, at 79; Texas Workforce Commission Charge, Dkt. 10-1, at 2). Rosario worked at the United States Veterans Affairs Medical Center in Kerrville, Texas ("VAMC"). (*Id.*). His coworkers there were employed by the United States Department of Veterans Affairs ("VA"). Rosario had no recorded disciplinary issues prior to the incident that led to his resignation. (Jaeger Dep., Dkt. 51-1, at 31).

On November 7, 2017, Rosario was involved in an interaction with VA coworker Melisa Martinez ("Martinez"), with whom he had previously been friendly. (Investigation Report, Dkt. 54-

---

[1] Also before the Court is Defendant's Motion to Continue Pretrial Conference and Trial. (Dkt. 66). Because the Court will grant TVC's motion for summary judgment, TVC's subsequent motion is moot.

1, at 42; Rosario Dep., Dkt. 62-1, at 69). Rosario informed Martinez that he was planning to retire and would "miss working with her because he felt they had grown closer than mere coworkers." (Resp., Dkt. 62, at 4; Rosario Dep., Dkt. 62-1, at 87). He told her that he "had an 'affection' for her that was more than a coworker." (Rosario Dep., Dkt. 54-1, at 28– 29). Rosario told Martinez he was attracted to her, and Martinez reminded Rosario that he was married. (*Id.* at 23–24). The parties present differing accounts of how the interaction unfolded next. According to Rosario, as Martinez was leaving his office, he stood to hug her, kissed her on the cheek, and she walked away without comment. (Resp., Dkt. 62, at 4; Rosario Dep., Dkt. 62-1, at 85, 90). Rosario and at least two other employees noted that employees "routinely hugged in that community." (Polanco Dep., Dkt. 62-1, at 195; Rosario Dep., Dkt. 62-1, at 69, 85; Tramel Dep., Dkt. 62-1, at 13). According to Martinez, if she had not turned her head to avoid him, Rosario would have kissed her on the mouth. (Martinez VA Statement, Dkt. 54-1, at 4). Martinez testified that she was scared of Rosario, was "scared of retaliation and behavior that he had already showed, some aggression," and was "fearful of losing [her] job." (Martinez Dep., Dkt. 54-1, at 16–17).

Following the interaction, Martinez initiated a complaint of sexual harassment against Rosario. After she left Rosario's office, she spoke with a coworker, VA Social Worker Megan Oliveri ("Oliveri"), and her supervisor, Chris Locke ("Locke"). (*Id.*; Investigation Report, Dkt. 54-1, at 43). Locke then contacted the TVC Human Resources Department. (*Id.*). Then-Director of Human Resources, Glenn Tramel ("Tramel"), received the complaint from Locke regarding Martinez's sexual harassment allegation. (Investigation Report, Dkt. 54-1, at 42). Tramel then informed the TVC Director of Claims, Victor Polanco, and the two traveled to VAMC to speak with Martinez and Rosario about the allegations. (*Id.*). Tramel and Polanco notified Rosario of the allegations and instructed him to write a statement in response. (Rosario Statement, Dkt. 54-1, at 48). Rosario admitted that, when Martinez was in his office, he "asked her to stay for a bit, because [he] wanted

2

to express something to her," he "told her that [he] had a level of 'affection' since [they] first met," and "[o]n an impulse, [he] kissed her on the cheek." (*Id.*; *see* Rosario Dep., Dkt. 54-1, at 22). Rosario was instructed not to have further contact with the social work office, where Martinez worked. (Investigation Report, Dkt. 54-1, at 46).

After conducting interviews with Martinez and Oliveri, Tramel and Polanco concluded that Rosario could and should be terminated. (*Id.* at 43–46, 49). They determined that his conduct violated TVC's sexual harassment policy. TVC policy 1.4.2.1 prohibits "[r]epeated unwanted sexual flirtations, advances or propositions" as well as "[u]ninvited, intentional physical contact such as touching, hugging, patting, brushing, or pinching," (Tramel Decl., Dkt. 54-1, at 40–41; TVC Policies, Dkt. 54-1, at 51). Based "largely" on Rosario's admissions in his statement, Tramel and Polanco agreed that "[b]y hugging and kissing Ms. Martinez, and by engaging in the inappropriate conversation about his attraction and affection to Ms. Martinez, Plaintiff violated [TVC's] policy against sexual harassment and committed a terminable offense." (Tramel Decl., Dkt. 54-1, at 41). TVC leadership was particularly concerned about the implications for its partnership with the VA if TVC employees sexually harassed VA employees and were not appropriately disciplined. (Investigation Report, Dkt. 54-1, at 46, 49). Tramel offered that Rosario "could possibly be given a warning, rehabilitated, and retained." (Tramel Decl., Dkt. 54-1, at 41; *see* Investigation Report, Dkt. 54-1, at 46). Polanco "disagreed and in the ensuing conferences with him and with other members of the TVC leadership, Executive Director Thomas Palladino ultimately decided that Plaintiff would be asked to resign or face termination." (Tramel Decl., Dkt. 54-1, at 41; *see* Investigation Report, Dkt. 54-1, at 49).

Executive Director Thomas Palladino ("Palladino") decided that Michael Jaeger ("Jaeger"), Rosario's immediate supervisor, should deliver the termination or resignation options to Rosario. (Jaeger Dep., Dkt. 54-1, at 34). Jaeger was not involved in the investigation and had no input in the

termination decision. (*See* Jaeger Dep., Dkt. 54-1, at 31, 33, 37, 39). Indeed, Jaeger never learned the identity of the complainant in the investigation. (*Id.* at 33, 35). He was never asked by his supervisors or anyone at TVC whether he thought Rosario should be terminated and "had no vote in" the decision. (*Id.* at 37). On November 20, 2017, Jaeger told Rosario of the termination decision and presented him with a choice between termination and resignation. (*Id.* at 33). Jaeger's supervisors gave him two letters to present to Rosario—one for termination and one for resignation—and Jaeger communicated to Rosario that he was to choose between the two. (*Id.*).

Rosario reacted to the news of his termination by explaining his actions to Jaeger. (*Id.*). The parties dispute the nature of the subsequent conversation. TVC claims that Jaeger "responded with incredulity, stating that with the 'Me-Too' movement happening at that time 'you go and do this.'" (Mot. Summ. J., Dkt. 54, at 10 (quoting Jaeger Dep., Dkt. 54-1, at 35)). According to TVC, and as Jaeger testified, Rosario did not mention that his termination would not have occurred if the incident happened a year earlier, nor did Jaeger tell Rosario that "the discipline would not have been termination had the complaint been filed a year earlier prior to the rise of the Me Too Movement." (Jaeger Dep., Dkt. 54-1, at 37–38; Mot. Summ. J., Dkt. 54, at 10). Rosario has offered several versions of the exchange. In his Response, he claims that Jaeger "remarked that the disciplinary action taken against Plaintiff would likely not have been as harsh had the complaint taken place prior to the rise of the Me Too Movement." (Resp., Dkt. 62, at 6 (citing Rosario Dep., Dkt. 62-1, at 67; Am. Compl., Dkt. 10, at 5)). Later, Rosario testified that Jaeger made the statement regarding Me Too on the day Rosario was informed of the allegations, a day when Jaeger was not present at VAMC. (Rosario Dep., Dkt. 54-1, at 20; Mot. Summ., J., Dkt. 54, at 10 n.1). Rosario also testified that he does not know who made the comments regarding Me Too. (Rosario Dep., Dkt. 54-1, at 21). Rosario appealed the termination decision based on alleged inadequacies of the investigation.

(Appeal Letter, Dkt. 62-1, at 3–5). The appeal was unsuccessful. (Resp., Dkt. 62, at 6). Rosario then filed a gender discrimination charge with the EEOC. (EEOC Charge, Dkt. 10-1).

Rosario now brings claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"). (Am. Compl., Dkt. 10, at 1). His claims under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.*, were previously dismissed by this Court. (Order, Dkt. 30; R. & R., Dkt. 28). TVC now seeks summary judgment on Rosario's sole remaining claim for gender discrimination under Title VII.

## II. LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient

5

to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin All. v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000).

### III. DISCUSSION

TVC seeks summary judgment on Rosario's gender discrimination claim of disparate treatment. (Mot. Summ. J, Dkt. 54). Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see* 42 U.S.C. § 2000e-2(m). A plaintiff may establish a claim of gender discrimination under Title VII in one of two ways: (1) by direct evidence that discrimination motivated the employment decision, or (2) by circumstantial evidence of the same. *Laxton v. Gap Inc.,* 333 F.3d 572, 578 (5th Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). TVC argues, and the Court agrees, that Rosario cannot meet his burden to raise a genuine issue of material fact under either theory. (Mot. Summ. J., Dkt. 54, at 12).

### A. Direct Evidence

Rosario claims that direct evidence establishes his claim of disparate treatment. (Resp., Dkt. 62, at 8). "Direct evidence is evidence which, if believed, proves [disparate treatment] without inference or presumption." *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 966 (5th Cir. 2016) (quoting *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005)). "[S]tatements or

6

documents which show on [their] face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action are direct evidence of discrimination." *Jones*, 427 F.3d at 993 (quoting *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003)).

Rosario attempts to create a factual dispute about whether his conduct constituted harassment or a violation of TVC policy. (Resp., Dkt. 62, at 10). While the Court is inclined to agree with Defendants that the finding of sexual harassment in violation of TVC's policy was proper, (*see* Mot. Summ. J., Dkt. 54, at 17), any factual dispute as to the exact contours of Rosario's allegedly harassing behavior are immaterial to the suit at hand. The material facts concern whether TVC discriminated in its decision to terminate Rosario, not whether Rosario committed any impermissible acts. And on the relevant question, the facts in evidence are uncontroverted.

Rosario's only direct evidence of discrimination is the alleged comments by Jaeger that may or may not have referenced the Me Too movement. (Rosario Dep., Dkt. 62-1, at 67; Resp., Dkt. 62, at 12). While the parties do dispute the nature of those comments, there is no dispute that Jaeger was uninvolved in the termination decision. "To be probative, allegedly discriminatory statements must be made by the relevant decision maker." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41–42 (5th Cir. 1996); *see Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002) ("Oral statements constitute evidence of discrimination if they indicate [discriminatory] animus and the speaker is principally responsible for the plaintiff's firing."). Here, Jaeger did not take part in the investigation of Rosario, the termination decision, nor the determination that he should be offered the option to resign, and as such he does not constitute a relevant decisionmaker. (Jaeger Dep.., Dkt. 54-1, at 33).

Jaeger testified that he only "became aware of [the] incident . . . when headquarters told [him] to go out to [VAMC] because they had received a report." (*Id.*, *id.* at 39). Jaeger knew only that

7

report "was inappropriate conduct," and he was told by headquarters that "[t]hey've done an investigation, and they've made a decision." (*Id.* at 33). Jaeger was "to go out and execute" the decision: he "was given two letters, a termination letter and a resignation letter," was told to "get a fellow supervisor at [his] level" and to "go out there and have Mr. Rosario sign . . . one of the two letters." (*Id.*). Indeed, Jaeger never even learned the identity of the complainant. (*Id.*). He was never asked by his supervisors or anyone at TVC whether he thought Rosario should be terminated and "had no vote in" the decision. (*Id.* at 37). He only became involved in the situation after the termination decision had been made by TVC leadership. His conversation with Rosario was no more than executing an order made by decisionmakers—which he communicated to Rosario—and does not render him a decisionmaker himself. (*Id.* at 34). For this reason alone, Rosario cannot rely on his interaction with Jaeger as direct evidence of discrimination. Therefore, he produces no direct evidence sufficient to survive summary judgment. (*See* Mot. Summ. J., Dkt. 54, at 8–10). For this reason alone, the Court finds that there is no issue of material fact and TVC is entitled to judgment as a matter of law.

### B. Circumstantial Evidence

Rosario also attempts to prove gender-based discrimination under Title VII through circumstantial evidence. Circumstantial claims are evaluated under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified by the Fifth Circuit in *Paske v. Fitzgerald*, 785 F.3d 977, 984 (5th Cir. 2015). "Under the modified *McDonnell Douglas* approach, the plaintiff must first demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact that either (1) the employer's reason is a pretext or (2) that the employer's reason, while true, is only one of the reasons for its conduct, and another

8

'motivating factor' is the plaintiff's protected characteristic." *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411–12 (5th Cir. 2007). To establish his prima facie case, Rosario must show that he "(1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside of the protected class, or, in the case of disparate treatment, shows that other similarly situated employees were treated more favorably." *Standley v. Rogers*, 680 F. App'x 326, 327 (5th Cir. 2017) (quoting *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004)).

"After the plaintiff establishes a prima facie case, the burden shifts to the employer to show a legitimate, nonretaliatory reason for the adverse employment action." *Black v. Pan Am. Laboratories, LLC*, 646 F.3d 254, 259 (5th Cir. 2011) (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)). Under the pretext theory, the plaintiff must rebut every nondiscriminatory reason put forth by the employer; under the mixed-motive theory, "if the plaintiff shows that the plaintiff's protected characteristic was a motivating factor, then the burden shifts to the employer to show that the adverse employment decision would have been made regardless of the characteristic." (*Id.*). It is sufficient for the plaintiff "to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *U. of Texas S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013).

There is no question that Rosario has established the first three elements of a prima facie case: (1) gender is a protected class; (2) he was qualified for the position he held for many years; and (3) his termination—or the choice between formal termination and resignation—was an adverse employment action. (*See* Resp., Dkt. 62, at 9). The parties do dispute whether other similarly situated employees were treated more favorably. Rosario claims that he was treated less favorably than Edith Disler, a woman who was terminated by TVC for violation of its sexual harassment policy. (*See*

9

Investigation Report, Dkt. 54-1, at 45; Disler Memo, Dkt. 54-1, at 52; Tramel Dec., Dkt. 54-1, at 41).

The Court finds that Rosario's arguments regarding Disler are unavailing. First, Rosario cannot establish that he and Disler were similarly situated. Similarly-situated employees must occupy "'nearly identical' circumstances; the Fifth Circuit defines 'similarly situated' narrowly." *Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 856 (S.D. Tex. 2010) (citing *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005)). "The 'nearly identical' standard . . . is a stringent standard—employees with different responsibilities, different supervisors, different capabilities, different work rule violations or different disciplinary records are not considered to be 'nearly identical.'" *Hockman v. Westward Comm., LLC*, 282 F. Supp. 2d 512, 527–28 (E.D. Tex. 2003). Here, Rosario and Disler had different jobs, different responsibilities, and different supervisors. Disler worked as a Division Director and Rosario as a Veteran's Benefits Counselor. (Disler Memo, Dkt. 54-1, at 53; Texas Workforce Commission Charge, Dkt. 10-1, at 2). Disler was a "senior leader in the agency"; Rosario had no subordinates and was the only TVC employee at VAMC. (Disler Palladino Memo, Dkt. 54-1, at 72; Rosario Dep., Dkt. 62-1, at 61). While perfect identity is not required to establish that a comparator is similarly situated, *see Nikolova v. U. of Texas at Austin*, 1:19-CV-877-RP, 2022 WL 466988, at *10 (W.D. Tex. Feb. 15, 2022) (citing *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)), there is insufficient basis here to find Rosario's comparator similarly situated.

Moreover, as TVC notes, Rosario and Disler were subjected to the same treatment. (Reply, Dkt. 63, at 4). Both employees were terminated after allegations of sexual harassment and violation of TVC policy. Rosario attempts to distinguish between the investigation procedures to which he and Disler were subjected. (*See* Resp., Dkt. 62, at 13–14). The fact that their investigations followed different trajectories cannot save Rosario's claim, as he cites no authority calling for uniform investigation procedures, nor for considering the investigations themselves to be ultimate

10

employment decisions under Title VII. *See Fortenberry v. Texas*, 75 Fed. Appx. 924, 928 (5th Cir. 2003); *Employees Banks v. E. Baton Rouge Par. Sch. Bd.*, 320 F.3d 570, 576–77 (5th Cir. 2003). Absent any such authority, the Court cannot consider the termination of two employees for sexual harassment allegations to be disparate treatment. Rosario does not dispute the nature of Disler's position nor that she was terminated following allegations of sexual harassment. (*See* Resp., Dkt. 62, at 13–14). Thus, no material facts on this issue are in dispute. Given the similar treatment of the only other employee Rosario identifies, whom he cannot demonstrate is similarly situated to himself, Rosario cannot establish the final element of a prima facie case. As such, the Court finds that Rosario cannot meet his burden to establish a prima facie case for discrimination.

Even if Rosario could establish a prima facie case, however, TVC is entitled to summary judgment because Rosario cannot demonstrate pretext nor evidence that discrimination was a motivating factor in TVC's decision.[2] Rosario appears to assert two bases for finding pretext or a discriminatory motive: (1) the alleged comment by Jaeger that he claims links his termination to the Me Too movement; and (2) TVC's failure to conduct an adequate investigation into the underlying incident. (Resp. Dkt. 62, at 10, 12). "An oral statement exhibiting discriminatory animus may be used to demonstrate pretext or, . . . as additional evidence of discrimination. . . . The remark must, first, demonstrate discriminatory animus and, second, be made by a person primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decisionmaker." *Laxton*, 333 F.3d at 583 (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000). As discussed above with respect to direct discrimination, Jaeger was not a person responsible for the termination decision, nor did he have any influence in the decision. (*See* Jaeger

---

[2] The Court also finds that TVC has asserted a legitimate, nondiscriminatory reason for its action—its belief that Rosario violated its sexual harassment policy—such that the burden shifts back to Rosario to demonstrate pretext. (Mot. Summ. J., Dkt. 54, at 17).

11

Dep., Dkt. 54-1, at 31, 33, 37, 39). For the same reasons, Jaeger's comment alone, by an employee who was not involved in the termination decision at issue, is insufficient to demonstrate pretext or discriminatory motive.

As to the adequacy of the investigation, Rosario notes that some courts have found that "failure to conduct a fair investigation can raise an inference of pretext." *Estate of Bassatt v. School Dist. No. 1*, 775 F.3d 1233, 1240 (10th Cir. 2014). While such inadequacies may indeed demonstrate pretext in some cases, here Rosario presents no such evidence. Indeed, in the very case he cites, the Court agreed with the employer that its investigatory practices did not constitute evidence of pretext. *Id.* at 1241. There, as here, the employer heard evidence from both sides in conducting its investigation, (*Id.* at 1241; Rosario Investigation Statement, Dkt. 62-1, at 2), and interviewed key witnesses to the underlying events. (*Bassatt*, 775 F.3d at 1240; Tramel Dep., Dkt. 62-1, at 15; Investigation Report, Dkt. 54-1, at 5–9). Rosario's unsupported assertions to the contrary are insufficient to create an issue of material fact necessary to avoid summary judgment. *See Davis v. Farmers Ins. Exch.*, 372 Fed. Appx. 517, 519 (5th Cir. 2010) ("[S]elf-serving statements, however, are not competent summary judgment evidence and cannot create material issues of fact"); *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010) (Plaintiff's "self-serving statements that he did not commit sexual harassment are insufficient to create a triable issue of fact"). As did the Court in *Bassatt*, the Court here finds no evidence that the investigation was inadequate, much less so flawed as to demonstrate pretext. Because Rosario cannot establish any material facts in dispute, and because the Court finds Rosario cannot make a prima facie case of discrimination nor demonstrate pretext or discriminatory motive, TVC is entitled to summary judgment as a matter of law.

## IV. CONCLUSION

For the reasons stated above, **IT IS ORDERED** that Texas Veterans Commission's Motion for Summary Judgment, (Dkt. 54), is **GRANTED**. Final judgment will be entered by separate order.

**SIGNED** on April 27, 2022.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE